# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| LYNNE AVRAM, on behalf of herself and all others similarly situated,<br><br>                                     Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS AMERICA, INC., and LOWE'S HOME CENTERS, INC.,<br><br>                                     Defendants. | Civil Action No. 2:11-CV-06973 (KM)(JBC)<br><br>**DECLARATION OF JOSEPH I. MARCHESE IN SUPPORT OF PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE CLARK'S JULY 24, 2015 ORDER ON DISCOVERY** |

I, Joseph I. Marchese, declare as follows:

1.      I am an attorney at law licensed to practice in the State of New York.  I have been admitted *pro hac vice* in this matter, and I am a partner in the law firm Bursor & Fisher, P.A., counsel of record for Plaintiff Lynne Avram.  I make this declaration in support of Plaintiff's Objections to Magistrate Judge Clark's July 24, 2015 Order on Discovery.  I have personal knowledge of the facts herein and if called as a witness, I could and would testify competently thereto under oath.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the July 24, 2015 hearing transcript.

3.      Attached hereto as **Exhibit B** is a true and correct copy of a certified translation of an internal Samsung email bearing Bates numbers SEA-018180-018183.

I declare under the penalty of perjury under the law of the State of New York that the foregoing is true and correct.  Executed on August 7, 2015 at New York, New York.

_____
Joseph I. Marchese

**EXHIBIT A**

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

AVRAM,                              .
                                    .
        Plaintiff,                  .
                                    . Case No. 11-cv-06973
vs.                                 .
                                    . Newark, New Jersey
SAMSUNG ELECTRONICS AMERICA,        . July 24, 2015
INC., et al.,                       .
                                    .
        Defendants.                 .


                  TRANSCRIPT OF TELECONFERENCE
          BEFORE THE HONORABLE JAMES B. CLARK, III
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

 For the Plaintiff:        LINDSEY H. TAYLOR, ESQ.
                           Carella, Byrne, Cecchi, Olstein,
                           Brody & Agnello
                           5 Becker Farm Road
                           Roseland, NJ 07021
                           (973) 994-1700
                           Email: Ltaylor@carellabyrne.com

                           JOSEPH I. MARCHESE, ESQ.
                           Bursor & Fisher, P.A.
                           888 Seventh Avenue
                           New York, NY 10019
                           (646) 837-7410
                           Email: Jmarchese@bursor.com

 For the Defendants:       JAMES J. O'HARA, ESQ.
                           Graham Curtin, P.A.
                           4 Headquarters Plaza
                           P.O. Box 1991
                           Morristown, NJ 07962-1991
                           (973) 292-1700

                           PHILIP M. OLISS, ESQ.
                           Squire Patton Boggs
                           4900 Key Tower 127 Public Square
                           Cleveland, OH 44114
                           (216) 479-8448
                           Email: Philip.oliss@squirepb.com

1  Audio Operator:

2  Transcription Service:        KING TRANSCRIPTION SERVICES
                                 3 South Corporate Drive, Suite 203
3                                Riverdale, NJ  07457
                                 (973) 237-6080
4
   Proceedings recorded by electronic sound recording; transcript
5  produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (Commencement of proceedings at 11:32 A.M.)

 2

 3          THE COURT:  Good morning, counsel, Judge Clark

 4   here.  Just let me say for the record, because we are on the

 5   record, this is Avram versus Samsung Electronics America

 6   Inc., et al., Civil Action Number 11-6973 (KM).  And it is

 7   about 11:33 on Friday, July 24th, 2015.

 8          Can you all just enter your appearances for the

 9   record, please.

10          MR. TAYLOR:  Good morning, Your Honor, Lindsey

11   Taylor from Carella Byrne on behalf of the plaintiffs.

12          THE COURT:  Good morning.

13          MR. MARCHESE:  Good morning, Your Honor, this is

14   Joseph Marchese from Bursor & Fisher on behalf of the

15   plaintiffs.

16          THE COURT:  Good morning.

17          MR. OLISS:  Good morning, Your Honor, this is Phil

18   Oliss from Squire Patton Boggs on behalf of defendant Samsung

19   Electronics America.

20          THE COURT:  Good morning.

21          MR. O'HARA:  And good morning, Your Honor, Jim

22   O'Hara with Graham Curtin, and it's -- we represent both

23   Samsung and Lowe's.

24          THE COURT:  Good morning.

25          Let me say as a first bit of housekeeping, I

1   understand you have two motions to seal in front of us, and I

2   had a conversation with my clerk.  She advises me that the

3   orders may not be in a form that the local rules require.  So

4   you may want to check with her, give a call in perhaps later

5   today or at your convenience.  I -- it's my understanding the

6   motions to seal are unopposed, but they -- the papers do need

7   to be in the form that's required by the rules before we can

8   actually enter that.  So I would just have you give her a

9   ring.  Her name's Amanda Laufer.

10           The primary -- the primary issue today seems to me

11  to be the letters that you have all written with respect to

12  this B goods discovery.  The plaintiff wrote a letter dated

13  June 26th, 2015, that is Document 116 on the docket.  And the

14  defendants replied on July 2d, 2015.  And that's

15  Document Number 119 on the docket.  And those documents are

16  currently sealed.

17           So I'm -- I guess I want to get right to it, and it

18  seems to me that all of the -- well, let me first ask.  Who

19  on the plaintiff's side's going to be doing the talking for

20  plaintiff, Mr. Taylor or Mr. Marchese.

21           MR. MARCHESE:  Mr. Marchese.

22           THE COURT:  Mr. Marchese.  Okay.

23           And how about for defendants, Mr. Oliss?

24           MR. O'HARA:  Yes, Your Honor.

25           THE COURT:  Okay.  Mr. Marchese, you mentioned a

1    couple of interrogatories.  You mention a 30(b)(6)

2    deposition.  All of this relates to your desire to discover

3    information with respect to the B goods, though.  Is that

4    right?

5            MR. MARCHESE:  And there were some document

6    requests as well, right.

7            THE COURT:  Right.  But it all -- it all relates to

8    the -- essentially to the same thing.  So we have to evaluate

9    whether or not this is an appropriate area for discovery.

10           Now, Mr. Marchese, my -- my question to you, the

11   defendants have said that this stuff is entirely irrelevant.

12   And they make the point that it doesn't really bear on the

13   benefit of the bargain analysis that you claim is so

14   important when you're trying to make out claims in a class

15   action like this.  Why -- why is this material, this B --

16   this B goods information relevant at all to what you're

17   trying to prove here, which, as I understand it, the loss

18   that each class member can fairly claim because the

19   refrigerators at issue were improper -- at least according to

20   you, improperly labeled as ENERGY STAR-efficient, which means

21   that in your view, they're more -- they're not as efficient

22   as advertised, let's say.

23           But why is the B goods information relevant to that

24   particular claim?

25           MR. MARCHESE:  Sure.  So it goes to -- it goes to

|Teleconference
|11-cv-06973, July 24, 2015                                                    6

1   our damages calculations.  And in particular, it shows the

2   value of the goods as accepted by the class members, that

3   being without being ENERGY STAR-qualified, because the --

4   the, quote/unquote, B goods that we're discussing, they are

5   units of the model RF26VAB.  After the EPA removed that model

6   from the list of ENERGY STAR-qualified refrigerators, and

7   then Samsung took back that remaining inventory from the

8   retailers in its distribution channel, stripped off the

9   ENERGY STAR markings or logos from the units, and then sold

10  those units for deeply discounted price, which -- to the

11  plaintiff's damages expert, the economist, Colin Weir, we --

12  reliable retail discount percentage by using the difference

13  between, for example, even if there's a wholesale price of

14  the B goods by Samsung and comparing it to the wholesale

15  price that Samsung received for new unit of the RF26 --

16            THE COURT:  But are you saying -- are you saying --

17            MR. MARCHESE:  -- ENERGY STAR.

18            THE COURT:  Are you saying that the B goods, that

19  the only reason that they were removed from the shelves and

20  sent back as B goods and resold was because of the ENERGY

21  STAR designation?  I mean, are you saying that --

22            MR. MARCHESE:  That is -- that is our understanding

23  and contention, Your Honor.

24            THE COURT:  Well, Mr. Oliss --

25            MR. MARCHESE:  It's the same refrigerator.  It's --

1    our contention is it's the same exact refrigerator minus the

2    ENERGY STAR.

3            And that is exactly what is the crux of this case.

4    And, you know, as the Court knows, we have -- as plaintiff,

5    we have the burden at the class certification stage, you

6    know, to show damages that are calculable on a classwide

7    basis to satisfy Rule 23(b)(3)'s predominance requirement

8    under Comcast.  And we also have the burden on the merits.

9    For example, with our expressed warranty claims to conduct a

10   benefit -- damages calculation.  And that we think that this

11   B goods information is a critical part of that.

12           THE COURT:  Well, Mr. Marchese, I mean, that -- let

13   me just talk about is I think is an important point.  You're

14   alleging that the only reason that these -- these

15   refrigerators were removed from the shelves, as it were, and

16   returned and sold as B goods is because they were improperly

17   labeled Energy Star-efficient or compliant and that they

18   stripped the ENERGY STAR label off and then resold them.

19           MR. MARCHESE:  Yes.

20           THE COURT:  My understanding of B goods, at least

21   in a classic sense is that they're -- they're kind of the --

22   you know, the there's something wrong with them --

23   something -- something more -- I don't know -- scratched,

24   they're dented, they're -- the doors are crooked.

25           I mean, Mr. Oliss, you tell me, is Mr. Marchese's

1   characterization of the reason why these B goods were

2   recalled correct?  Or is there something more to it?

3              MR. O'HARA:  There is something more to it,

4   Your Honor.

5              So part of the background of this case is that the

6   model at issue, this 26VAB was actually in end of life in

7   2009.  It was disqualified from the ENERGY STAR program in

8   March of 2010.  But it had already been transitioned out in

9   favor of newer models.

10             And that -- the testimony of the witnesses --

11   Mr. McCarter explains this, but the 26VAB was transitioned

12   out, really, by summer or fall of 2009, leading up to Black

13   Friday and the introduction of new models.

14             So when the DOE approached Samsung with the issue

15   of the ENERGY STAR testing that had been performed, you know,

16   and part of the story, of course, is the incentive for

17   Samsung to dispute the delisting process was pretty low,

18   given the status of the refrigerator, but more to the point,

19   which Samsung agreed to do was to go to Lowe's in an attempt

20   to identify what refrigerators may be remaining in inventory.

21   And not surprisingly it turned out that there were some, a

22   few hundred in inventory, but they were, as we understand it,

23   exactly what Your Honor just described, scratch and dent or

24   open box, floor models, not -- you know, not the shiny, new

25   refrigerators that you have -- that you would have seen a

 1    year earlier.

 2            So they -- you know, they collected these

 3    refrigerators to remove them from the distribution channel,

 4    and donated some to charity, and sold some others.  We do not

 5    have good records of what happened to these particular

 6    refrigerators.  But the full story is that while they were

 7    removed for the -- because of the ENERGY STAR issues, the

 8    refrigerators we're talking about are not really comparable

 9    to the refrigerators that were sold to members of the class

10    because they were open box models.

11            THE COURT:  Mr. Marchese, I mean, I understand why

12    you would want to get this information and rely on it,

13    because these things were -- it sounds like were probably

14    sold at a deep, deep discount, and that would mean, at least

15    the argument would follow *ipso facto* that the ENERGY STAR

16    designation was worth, you know, so very much.

17            But I mean, in a practical sense, honestly, isn't

18    getting this information and isn't making that pitch as to a

19    bunch of late -- you know, late-term refrigerators, many of

20    which are scratched and dented, many of which are donated

21    because they don't know what to do with them, isn't that just

22    going to muddy the waters?  I mean, it seems to me, not only

23    it may not be relevant, it may be contrarily irrelevant.

24            Are you still -- you still with us, Mr. Marchese?

25            Oh, boy, Mr. Oliss, are you with us?

1            MR. O'HARA:  I am.

2            THE COURT:  Mr. Marchese, do we still have with us?

3            MR. TAYLOR:  Let me check, Your Honor.

4            THE COURT:  Is that Mr. Taylor?

5            MR. TAYLOR:  Yes.

6            THE COURT:  All right.  Yeah, why -- why don't we

7    see if we can put him back into the call.

8            MR. TAYLOR:  Okay, hold on a sec.

9            THE COURT:  All right.

10       (Pause in proceedings)

11           THE COURT:  Who do we still have on the line right

12   now?

13           MR. OLISS:  You still have Jim O'Hara with Graham

14   Curtin.

15           THE COURT:  Okay.  Mr. Oliss, are you still with

16   us?

17           MR. OLISS:  I am, Your Honor.

18           THE COURT:  All right.  Mr. Taylor, are you still

19   with us or?

20           I tell you what, we'll go off the record right now.

21   And people can talk freely.

22       (Pause in proceedings)

23           THE COURT:  All right.  Hold on, we went off the

24   record, just so we weren't sitting in silence for a long,

25   long time.

1          Mr. Marchese, do we have you back?

2          MR. TAYLOR:  Yes, I tried to call, and I couldn't

3    get through.  I think they're having problems with their

4    phone.  I'm going to email Joe right now just to see what's

5    happening.

6          MR. MARCHESE:  Hello, this is Joe Marchese.  I got

7    dropped on the call.  Sorry about that.

8          THE COURT:  All right.  Mr. Marchese, we are -- we

9    are still on.  We stopped the record when we realized we

10   didn't have you any no longer, and now we're back -- we're

11   back on the record.

12         Which was the last thing that you remember hearing

13   when we were talking?

14         MR. MARCHESE:  The last thing that I remember

15   hearing was you, Judge, saying, now, I could understand,

16   Mr. Marchese, why you would want -- and then I cut out.

17         THE COURT:  Okay.  All right.  Well, what I had

18   said is I can understand why you would want this material,

19   you know, all this B goods, refrigerator information,

20   especially as Mr. Oliss has explained it.  I mean, sounds

21   like a lot of these refrigerators were jettisoned either for

22   free or at a fire sale because they were late model and

23   nobody knew what to do with them, but I don't know that it's

24   particularly helpful in determining the true value of what

25   the ENERGY STAR label is worth.

 1          And what I -- what I had said just to finish off

 2   this, you know, if we have got scratch and dent things, we've

 3   got late-model refrigerators that have been discontinued,

 4   they're being given away, you've got all sorts of different

 5   refrigerators here, it seems to me that we're not only

 6   getting information that's not particularly relevant, but may

 7   be irrelevant and it may be something that would muddy the

 8   waters in a way that we don't want to muddy them.

 9          MR. MARCHESE:  Well -- I'm sorry.  Are you

10   finished, Your Honor, or ...

11          THE COURT:  No, yeah, I -- go ahead.  I was just

12   going to ask you what your thoughts were.

13          MR. MARCHESE:  Yeah, well, my thought on that is

14   this, you know, of course, you know, I trust that, you know,

15   that defense counsel is not misleading anything.  But I think

16   as plaintiff's counsel, we have the right to verify that by

17   probing at the documentation and getting testimony of someone

18   knowledgeable, a witness firsthand knowledge of these B good

19   sales.

20          In fact, you know, as Mr. Oliss acknowledged,

21   Mr. McCarter, in his deposition, testified that the reason

22   that there was this recoupment of the RF26VAB models was

23   because of the ENERGY STAR disqualification of that model

24   line by the government.  And so I am not ready, as

25   plaintiff's counsel, to -- to just set aside this -- you

1   know, this information, which I -- you know, I do believe is

2   very relevant toward one methodology of getting at a retail

3   discount applicable to the specific ENERGY STAR qualification

4   of that refrigerator.

5          THE COURT:  Well, and I -- you know, I appreciate

6   you just don't want to waive the information, but I'm -- I

7   don't know that I'm sold that it's going to be more -- more

8   helpful than it will be harmful, if it has any effect at all.

9          I think in the end the defendant's point may be

10  well taken that because you have late-model refrigerators

11  that -- and because you have a good number that were dented

12  and scratched with, you know, had all sorts of other

13  problems, this information may -- may have very minimal

14  relevance, and, you know, in your own letter, you cited for

15  me, a case that -- just bear with me for a second.

16         MR. MARCHESE:  Are you talking about Barton?

17         THE COURT:  Yeah, you cited the quote from the

18  Barton case.  It says:  The party resisting production of

19  discovery bears the burden of establishing lack of relevancy

20  or undue burden.

21         But then you go on -- it goes on to say:  They must

22  demonstrate to the court that the requested documents either

23  do not come within the broad scope of relevance, or else that

24  they are of such marginal relevance, that the potential harm

25  occasioned by a discovery would outweigh the ordinary

1    presumption in favor of broad disclosure.

2         I mean, it sounds to me at best, this stuff would

3    be marginally relevant.  And, in fact, again, I think it

4    may -- it may muddy the waters.  My -- my thinking would be

5    that the judge is going to say, look, this doesn't help --

6    this doesn't help us at all.  This isn't clearing anything up

7    with respect to what the value of the ENERGY STAR designation

8    is, whether it's correct or incorrect.  I think that there

9    are probably a variety of other avenues you can -- you can

10   probe or go down that -- and I'm sure, you have gone down

11   many of them that are giving a much better picture of what

12   the ENERGY STAR designation is really worth.

13        Mr. Oliss, what are you thoughts on this?

14        MR. OLISS:  Well, Your Honor, first, we do agree,

15   and we think this is really a classic example of the marginal

16   relevance of the discovery being outweighed by the burden.

17        I would also add that I wasn't sure that we would

18   go forward today because I thought that plaintiffs might take

19   the position that this issue has been mooted.  We have

20   already received the expert report of plaintiff's economist,

21   Colin Weir.  And if you recall from plaintiff's counsel's

22   letter, the -- the argument was that this information was

23   necessary in order for him to prepare his damages model.

24        But what we've seen in the expert report is that

25   Mr. Weir does, in fact, argue that the difference between the

1  B goods' value, as they term it, and the retail price of

2  these refrigerators as sold to consumers at Lowe's in the

3  prior years is some measure of damages.

4        He gives no indication that he doesn't have the

5  information he needs in order to make that argument.

6  Obviously, we don't think much of it.  We think it suffers

7  from all the flaws that you've just identified, Your Honor,

8  in the sense that it doesn't really capture something

9  meaningful and really only confuses the issues.

10        But, you know, we did produce documents in this

11  case, a lot documents, of those goods, the B goods.  Back in,

12  you know, late last year, we negotiated search terms.  We did

13  our ESI, and some of the documents resulted go to that issue,

14  and they were able to make use of those documents already

15  from Mr. Weir's report.

16        So I'm not -- and, again, he doesn't indicate in

17  his report that he doesn't have the information he needs --

18        THE COURT:  Well, I'm assuming -- I'm assuming that

19  the fact that we're having this call, Mr. Marchese has not

20  taken the position that this is mooted.

21        Is that right, Mr. Marchese?

22        MR. MARCHESE:  That's right, Your Honor.  And in

23  part, you know, we -- we believe that the defendant has --

24  has sold some of these units, the B goods, also to end users

25  as well as to B good distributors.  And as you could see from

 1  defendant's letter, that's obviously an argument that they

 2  are holding on to is that, you know, the wholesale pricing

 3  cannot be used to arrive at a retail discount.  You know,

 4  obviously, that's not what our expert's telling us, but you

 5  know, it seems like there are about a hundred more units that

 6  we don't have any information on.  And we don't have any

 7  context really in terms of --

 8              THE COURT:  Well, Mr. --

 9              MR. MARCHESE:  -- what the internal -- you know,

10  what the internal thinking was about -- you know, about the

11  dispositions of these refrigerators, and, you know, we feel

12  like we're entitled to that.

13              THE COURT:  Well, Mr. Marchese, answer me

14  something, another concern apart from the relevance concern

15  is the timeliness concern.  We are actually past the end of

16  fact discovery.  Isn't that right?  I mean, at least as it

17  stands right now.  And --

18              MR. MARCHESE:  Yes.

19              THE COURT:  And the defendants have said that you

20  had information, that there was some back-and-forth about

21  B groups late last year, and now, here we are, and you're

22  saying this deposition of Mr. McCarter was what triggered the

23  interest in the B goods discovery.

24              But I mean is their point well taken that this was

25  a topic that -- that came up long ago and could have been

1  explored many, many months ago, and why are we doing it here

2  at the end of discovery when we've got a -- you know, an '11

3  docket case that really ought to move along.

4          MR. MARCHESE:  Sure, Your Honor, the -- we had some

5  documents that said, from -- from Samsung that said we're

6  thinking about selling the refrigerators as B goods.

7          Now, I don't know what B goods are because I am not

8  particularly familiar with that concept, you know, in the

9  industry.

10         And when I was at the deposition of Mr. McCarter,

11  and he made himself available on May 8th, I asked him, you

12  know, what are the B goods.

13         And he gave me a general description that said,

14  well, these are products that are sold at a discount.  But he

15  said, you know, I don't know what determines a B goods.  I

16  don't know the cost of the B goods.

17         And so he -- he testified that he didn't have more

18  specific knowledge than that.

19         We got the deposition transcript on May 19th,

20  analyzed it, and we realized the significance of -- of this

21  concept of the B good sale in connection with the ENERGY STAR

22  disqualification.  And only two days later, we got out some

23  follow-up written discovery and, you know -- and then we also

24  added a topic to the 30(b)(6) deposition notice.

25         So I actually think that rather than delay, this --

1  this was a pretty high-level of quality of follow-up

2  discovery on -- on our part.  And I don't think it's untimely

3  whatsoever.  And we tried to raise all of these -- you know,

4  this dispute within -- within the time period of fact

5  discovery.  And that's why we, you know -- reviewed the

6  defendant's objections and responses to our written discovery

7  and tried to convene a meet-and-confer almost immediately, I

8  think, within a day of receiving them.

9          So --

10         THE COURT:  All right.

11         MR. TAYLOR:  -- I don't think --

12     (Simultaneous conversation)

13         THE COURT:  All right.  Well, Mr. Oliss, you've

14  represented today -- I mean, Mr. -- Mr. Marchese has said,

15  gee, it's our impression, and we want to test the truth of

16  whether or not these refrigerators, you know, really were

17  just pulled back because of the ENERGY STAR problem and then

18  were resold.  You're representing that, well, that's not the

19  only reason some of these refrigerators were pulled back, but

20  that scratch and dent and other reasons might have been

21  rel- -- a part of the deal with at least some of the

22  refrigerators.

23         Is that right?

24         MR. OLISS:  Well, yeah, let me just clarify that,

25  that the B goods are, generally speaking, open boxed models,

1  as I understand it, so they're going to be returns, floor

2  models, things of that nature.

3        So, you know, we don't dispute that these

4  refrigerators were gathered and returned because of the

5  ENERGY STAR issue, but they were not pulled from the shelves

6  in the sense that they were, you know, actively, you know,

7  current models.

8        THE COURT:  Yeah, I -- Mr. Marchese, I just don't

9  see, given that the model was being discontinued, given that

10  you've got the representation that these were floor models,

11  that they were -- you know, that they were late-term things

12  that all being sent back, and that they were -- you know,

13  given that they were late-term models sold under

14  substantially or disposed of, and some were just given away,

15  but disposed of under substantially different conditions than

16  they -- you know, refrigerators that are -- that are sold,

17  you know, on an ongoing basis as a viable model and as

18  brand-new, I just don't see how this information is going to

19  help advance the ball in this case.  You know, we already

20  have your expert report.  I'm sure he makes some very good

21  arguments as to what the ENERGY STAR designation is worth.

22  And I think that this is only going to muddy the waters.  It

23  may muddy the waters in your favor, but it muddies the

24  waters, and it muddies the waters in a way that I don't think

25  the waters should be muddied.  I think that this material or

1    this information is -- is -- as the defendants argued, either

2    wholly irrelevant or, again, turning back to your reference

3    to the Barton case, they're at least of marginal relevance

4    that the potential harm occasioned by this discovery would

5    the outweigh presumption in favor of broad discovery.  And I

6    think that the disclosure, to continue with that quote, would

7    be burdensome.  And given that we're at the end of fact

8    discovery and that we need to keep this case moved forward --

9    it's an '11 case -- I'm going to foreclose this whole B goods

10   discovery avenue and deny the applications that you've made

11   in your June 26th letter.  We'll have an order that follows

12   this that memorializes it, but it's going to be largely for

13   the reasons and based upon our discussion on the record.

14            That said, we have a few housekeeping things I need

15   to -- that I think I should discuss with you all.

16            Mr. Marchese, given that fact discovery is closed,

17   your -- everybody's working on expert discovery.  Mr. Oliss

18   said that you just served your report.  When are -- when are

19   the responsive reports due?

20            MR. MARCHESE:  I believe under the current -- under

21   the current schedule, the responsive -- or rebuttal expert

22   reports, if any, I believe it would be at the end of August,

23   but I -- maybe -- maybe Mr. Oliss knows more exactly.

24            THE COURT:  All right.

25            MR. OLISS:  That's correct.  Under the order, the

 1  rebuttal reports are -- the defendant's reports are due to be

 2  filed -- or served, excuse me, on August 31st, I believe.

 3            THE COURT:  All right.  And then you're going to be

 4  able to abide by that date, Mr. Oliss?

 5            MR. OLISS:  Well, I hope so.  We do have another

 6  issue in that I don't know if it's ready for you or not and

 7  then if we'll be able to resolve it, but plaintiffs did

 8  produce affidavits and declarations from three experts on

 9  July 15th, which was their deadline to do so.

10       (Simultaneous conversation)

11            THE COURT:  -- before you even go -- before you

12  even go --

13       (Simultaneous conversation)

14            THE COURT:  -- before you even go down this road,

15  let me just ask Mr. Marchese, Mr. Marchese, have you served

16  your expert reports?  Or do you have more to come?

17            MR. MARCHESE:  We served them, but there -- you

18  know, there was an issue that was raised by defense counsel,

19  which we need to follow up with defense counsel about.

20            But we -- there are no additional experts that we

21  plan to serve any more reports from.

22            THE COURT:  All right.

23            Well, then, Mr. Oliss, why don't you -- it sounds

24  like you need to talk.  If it turns out that you need more

25  time or you need the Court to weigh in on something that's

1  going on with the experts, certainly let us know, but I think

2  we're putting the cart before the horse, if we're going to

3  have a lengthy discussion about that today on the record.

4          One -- the one other question that I have for

5  Mr. Marchese is we haven't had a class certification motion.

6  Isn't that right?

7          MR. MARCHESE:  That's right.  My understanding is

8  that under the existing schedule, the class certification

9  motion's due to be filed on September 23d.

10          THE COURT:  Okay.  All right.  Well, then you'll --

11  I won't disturb that unless I hear from you, you know, that

12  there's a problem with experts and that other dates need to

13  be tinkered with.  I -- you know, it's an '11 docket, so I

14  want to keep it moving, but I also don't want to be entirely

15  unreasonable, if you run into some minor problems and need

16  slight adjustments to the dates.

17          I guess the only other thing, I don't want you to

18  tell me the content of any settlement discussions you've had,

19  because we're on the record, but have you had settlement

20  discussions?

21          MR. OLISS:  We have, Your Honor, and I think I can

22  tell you this much that the defendants recently made a

23  counter to discovery demand with a counteroffer, and we have

24  not received a -- well, we received a nonresponse, I suppose,

25  I can say, from plaintiff.  We've asked them to keep

1   considering that and get back to us if they think there's

2   something to talk about.  So we think that that -- we had

3   that settlement discussion so the ball is in the plaintiff's

4   court at this point because we made the last proposal.

5            THE COURT:  All right.  Well, Mr. Marchese, if you

6   ever come -- if you come to the conclusion that their offer

7   is, you know, interesting and you think you would benefit

8   from a conference with the Court in an effort to try and

9   settle it, we would be happy to make time and do that.  All

10  right?

11           MR. TAYLOR:  Very well, Your Honor, thank you.

12           THE COURT:  All right.  I guess -- you know, I

13  think that's it for today.  You tell me if there's anything

14  else.  If there is not, what I'm probably going to do is set

15  a date for an early September conference call, just to make

16  sure that there, you know, haven't been any problems with

17  getting the expert discovery done and whether we're on track

18  for the class certification motion.

19           Is there anything else?

20           MR. OLISS:  Your Honor, this is Phil Oliss.  I

21  think we have an August conference call.

22           THE COURT:  Oh, we do?

23           MR. OLISS:  -- already --

24           THE COURT:  Oh, it's perfectly possible.  I -- if

25  we do, let's just leave it on.  All right?

1          MR. OLISS:  Okay.

2          THE COURT:  We will check.  If there's an August

3   call already scheduled, we'll leave it on.  If there's not,

4   keep your eyes open and we'll set another one for either

5   August or early September.  All right?

6          MR. OLISS:  Your Honor, it's Docket Number 115,

7   August 19th, 2015, at 11:30.

8          THE COURT:  August 19, okay, that sounds fine.  By

9   then, you should have an idea of where we're going with the

10  expert discovery.

11         Hold on one second, folks.

12         Okay, folks, we're going to go off the record now,

13  because I think we've come to an end with what we need to

14  talk --

15         (Conclusion of proceedings at 12:07 P.M.)

16

17

18

19

20

21

22

23

24

25

```
 1                          Certification

 2          I, SARA L. KERN, Transcriptionist, do hereby certify

 3     that the 25 pages contained herein constitute a full, true,

 4     and accurate transcript from the official electronic

 5     recording of the proceedings had in the above-entitled

 6     matter; that research was performed on the spelling of proper

 7     names and utilizing the information provided, but that in

 8     many cases the spellings were educated guesses; that the

 9     transcript was prepared by me or under my direction and was

10     done to the best of my skill and ability.

11          I further certify that I am in no way related to any of

12     the parties hereto nor am I in any way interested in the

13     outcome hereof.

14

15

16

17

18     S/ Sara L. Kern                    30th of July, 2015

19     Signature of Approved Transcriber            Date

20

21
       Sara L. Kern, CET**D-338
22     King Transcription Services
       3 South Corporate Drive, Suite 203
23     Riverdale, NJ  07457
       (973) 237-6080
24

25
```

**EXHIBIT B**

[REDACTED]